IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JERMAINE HERNANDEZ,              *

    Plaintiff,                  *

vs.                             *

                              CASE NO. 4:25-CV-423 (CDL)

CITY OF COLUMBUS, *et al.*,      *

    Defendants.                 *

## O R D E R

Columbus police officers Xavier Perez and Kenneth Rammage stopped Jermaine Hernandez for speeding. As the officers approached Hernandez's vehicle on foot, the vehicle's engine revved, there was a loud popping noise, and Hernandez could be seen leaning out of the vehicle's window. The officers fired at least twenty-five rounds of ammunition into Hernandez's vehicle, striking Hernandez once in his left ring finger. Hernandez asserts claims under 42 U.S.C. § 1983 and Georgia law against the officers, the Columbus Consolidated Government, and the Columbus police chief. Defendants filed a motion to dismiss all of Hernandez's claims. For the reasons set forth below, the Court grants the motion (ECF No. 6) as to Hernandez's § 1983 claims. The Court declines to exercise supplemental jurisdiction over Hernandez's state law claims, and those claims are dismissed without prejudice.

MOTION TO DISMISS STANDARD

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.   The factual allegations must "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims.   *Id.* at 556.   But "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'"   *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556).

Normally, when the Court decides a motion to dismiss, it may only consider "the pleadings and any exhibits attached to the pleadings."   *Swinford v. Santos*, 121 F.4th 179, 186-87 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 204 (2025).   The Court, however, "may consider evidence attached to a motion to dismiss without converting the motion into a motion for summary judgment 'if the [evidence] is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged.'" *Id.* at 187 (quoting *Johnson v. City of Atlanta*, 107 F.4th 1292,

2

1300 (11th Cir. 2024)).  Under this rule, the Court may consider a video recording that depicts the events central to a plaintiff's claims.

Here, Defendants submitted two video recordings with their motion to dismiss.  Hernandez does not dispute that the video recordings are central to his claims; in fact, his complaint references the video recordings to support most of his factual allegations about the events giving rise to this action.  In his response brief, Hernandez objected to any consideration of the specific video files Defendants submitted to the Court until Defendants provided him with a copy of those files (although Hernandez referred to the video footage in his complaint and his brief).    Defendants represent that Hernandez's counsel has received the video files.  Defendants suggested that if Hernandez intended to maintain an authenticity objection to the video recordings, he should be permitted to file a sur-reply on the issue.  Hernandez did not file a sur-reply or seek leave to file a sur-reply on authenticity grounds, so it appears that Hernandez has abandoned his authenticity challenge to the video recordings.

The area depicted in the video recordings is well-lit, the recordings are in focus, and the footage contains both audio and visual depictions of the events that happened.  Accordingly, the Court may consider the video recordings in ruling on the motion to dismiss.  Hernandez cautions that the Court should not accept

3

Defendants' *interpretation* of what the video depicts.  That is correct: the Court must accept the video's depiction of the facts and "view the facts in the light depicted by the video."  *Id.* at 190 (quoting *Baker v. City of Madison*, 67 F.4th 1268, 1278 (11th Cir. 2023)).  If the video "is clear and obviously contradicts the plaintiff's alleged facts," the Court must "accept the video's depiction instead of the complaint's account."  *Id.* (quoting *Baker*, 67 F.4th at 1277-78).

FACTUAL ALLEGATIONS

Columbus Consolidated Government ("CCG") police officers Xavier Perez and Kenneth Rammage were in uniform and on active duty conducting traffic enforcement at 8:00 a.m. on February 7, 2024.  Perez, who was in the field training program, was driving the vehicle, and his training officer Rammage was the passenger.  In his complaint, Hernandez makes a series of factual allegations that reference the officers' dash camera and body camera video recordings.  *See*, *e.g.*, Compl. ¶¶ 19-39, ECF No. 1 (alleging various facts "As evidenced by" the video recordings).  Based on the Court's careful review, the video recordings depict the following facts.

The patrol vehicle of Perez and Rammage is stopped behind a Ford Explorer on the shoulder of Manchester Expressway when an officer says, "oh shit" and then "go, go, go ninety-six!  Turn it on.  Go."  Landrigan Suppl. Decl. Ex. A-1, Dash Cam Recording at

00:09-00:20 (on file with the Court).  A BMW passes the officers on the left, and Perez initiates a traffic stop.  The BMW immediately pulls over and puts on the hazard lights.  *Id.* at 00:23-00:33.  After the BMW is stopped, its driver, Hernandez, can be seen moving around in the front seat and appears to bend toward the passenger side a few times.  *Id.* at 00:42-02:07.  Perez and Rammage exit their patrol vehicle and walk toward the BMW.  As the officers walk toward the BMW, the engine revs and a loud popping noise comes from the BMW.  *Id.* at 02:11-02:13.  Hernandez's arm, head, and upper body can be seen coming out of the driver's side window.  *Id.*  The vehicle does not move.  *Id.*  The officers immediately draw their weapons and fire, yelling "shots fired" and retreating from the BMW.  *Id.* at 02:13-02:16.  Hernandez alleges that they fired at least twenty-five rounds of ammunition at him.

After the shooting ends, Rammage yells, "let me see your hands" and "keep your hands where I can see 'em." *Id.* at 02:21-02:47.  He calls for assistance and says that a person is injured. Landrigan Decl. Ex. A-2, Body Camera Recording 00:47-00:56 (on file with the Court).  Rammage repeats, "keep your hands where I can see 'em" and asks if Hernandez has any weapons.  *Id.* at 01:00-01:07.  Hernandez says that he has no weapons.  Rammage asks Perez, "You see how fast he jumped?"  *Id.* at 01:16-01:18.  Rammage asks Hernandez if he is okay.  *Id.* at 01:30-01:31.  Hernandez indicates that he needs assistance, and Rammage tells dispatch that he needs

EMS.  *Id.* at 01:31-01:51.  Rammage asks Perez, "What was he doing? Did you see that?" *Id.* at 02:07-02:12.  Perez responds, "Yeah, that's why I backed up." *Id.* at 02:12-02:14.

Rammage approaches the BMW, reminding Hernandez to keep his hands where Rammage can see them, and asks Hernandez where he is hurt.  *Id.* at 02:21-02:46.  Rammage also asks Hernandez if he has any weapons, and Hernandez says no.  *Id.* at 02:47-02:49.  Rammage asks, "why did you do that, man?" *Id.* at 03:02-03:04. Hernandez responds, "I didn't mean to." *Id.* at 03:04-03:05.  Rammage says, "Well you just jumped out around on us, dude." *Id.* at 03:05-03:06. Hernandez replies, "I didn't mean to . . . my wallet.  I was trying to get my wallet."  *Id.* at 03:07-03:10.  Perez opens Hernandez's door, and Hernandez says, "Just get me out, but don't shoot me please."  *Id.* at 03:32-03:34.  The officers pat down Hernandez for weapons.  *Id.* at 03:48-4:06.  Hernandez says, "I didn't mean to. I had boogers on my window I tried to wipe off and when I reached over I accidentally pressed the gas." *Id.* at 04:02-04:10.  Rammage and Perez try to figure out where Hernandez was shot, then other officers arrive on the scene and render aid to Hernandez.  *Id.* at 04:12-05:14.  It is undisputed that Columbus Fire EMS transported Hernandez to a local hospital, where he underwent surgery to repair his finger.  It is also undisputed that Rammage and Perez were later indicted for aggravated battery based on the shooting.  Their superior court criminal case remains pending.

Hernandez contends that the dash cam video shows that Perez could see him cleaning his back window with a blanket from his vehicle.  Compl. ¶ 21.  Hernandez also asserts that the dash cam video shows that Hernandez was unarmed and posing no threat to anyone before the officers shot him.  Based on the Court's review, it is clear from the video that Hernandez was leaning out of his window when the engine revved and a loud popping noise could be heard.  But the video does not clearly depict what Hernandez was doing while he was leaning out of the window before the officers shot him, it does not clearly show what he had in his hand, and it does not clearly show that he was unarmed.

## DISCUSSION

Hernandez brought claims against Rammage and Perez under 42 U.S.C. § 1983, asserting that the officers violated his Fourth Amendment right to be free from the use of excessive force. Hernandez also asserts § 1983 claims against Columbus Police Chief Stoney Mathis and CCG, as well as several state law claims against all Defendants.  The Court addresses each claim in turn.

## I.   Section 1983 Claims Against Rammage and Perez

Rammage and Perez argue that they are entitled to qualified immunity on the § 1983 claims against them.  "Qualified immunity shields government employees from suit against them in their individual capacities for discretionary actions they perform in carrying out their duties."  *Swinford*, 121 F.4th at 188.  The

defendant must "show that he was acting within the scope of his discretionary authority when committing the challenged act." *Id.* If the defendant does that, the plaintiff "'must show that qualified immunity is not appropriate' by establishing: '(1) the defendant violated a constitutional right, and (2) that constitutional right was "clearly established" at the time of the defendant's actions.'" *Id.* (quoting *Brooks v. Miller*, 78 F.4th 1267, 1280 (11th Cir. 2023)).

Relying on unpersuasive dicta from an unpublished order by a magistrate judge in another district, Hernandez questions whether Rammage and Perez showed that they were acting within the scope of their discretionary authority at the time of the events giving rise to this action.[1]  To determine whether a government official acted within the scope of his discretionary authority, the Court must "ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  The Court should "look to the general nature of the

---

[1] *See Hill v. Florio*, No. CV424-036, 2025 WL 961673, at *3 (S.D. Ga. Mar. 31, 2025) (acknowledging that a police officer's official responsibilities include the power to make an arrest and transport a suspect to jail, noting ambiguity on whether the challenged arrest and detention were in the officers' discretionary authority (without a clear explanation of what was ambiguous), assuming without deciding that the defendants were acting in their discretionary authority when they arrested the plaintiff and transported him to jail, and finding no constitutional violation).

defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* at 1266. In the context of a Fourth Amendment claim, the relevant question is not whether the officer "has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures *in general* is a part of his job-related powers and responsibilities." *Id.* Here, Hernandez does not dispute that during the events giving rise to this action, Rammage and Perez were conducting a traffic stop that fell within their legitimate job description. Hernandez also does not dispute that the power to use force during a traffic stop falls within the range of discretion that comes with a police officer's job. For these reasons, the Court finds that Rammage and Perez met their burden of showing that the challenged actions were within their discretionary authority.

The next question is whether Hernandez alleges sufficient facts to show that Rammage and Perez violated his clearly established constitutional rights. The Fourth Amendment provides a "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This right against unreasonable seizures "encompasses the plain right to be free from excessive force." *Swinford*, 121 F.4th at 189 (quoting

*Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)).  "A police officer's use of deadly force violates the Fourth Amendment when it is not 'objectively reasonable.'"  *Barnes v. Felix*, 605 U.S. 73, 76 (2025) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The "inquiry into reasonableness . . . requires assessing the 'totality of the circumstances.'"  *Id.* (quoting *Graham*, 490 U.S. at 396).  Thus, the Court must "examine the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.'"  *Swinford*, 121 F.4th at 189 (quoting *Baker v. City of Madison*, 67 F.4th 1268, 1279 (11th Cir. 2023)).  "Other considerations are the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in good faith or maliciously and sadistically."  *Id.* (quoting *Baker*, 67 F.4th at 1279).  There is no time limit for the "totality of the circumstances" inquiry—the context of the stop matters, and "the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others."  *Barnes*, 605 U.S. at 80.

In assessing the reasonableness of an officer's use of force, the *facts* must be construed "in the light most favorable to the

plaintiffs," while the *reasonableness* of the officer's conduct is viewed "from the perspective of 'a reasonable officer on the scene at the time the events unfolded.'"  *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021) (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010)).  The "inquiry does not employ 'the 20/20 vision of hindsight'" but instead allows "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014)).

It is "reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril."  *Id.* (quoting *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015)).[2]  Accordingly, if a suspect "threatens the officer with a [deadly] weapon," then an officer's use of deadly force does not violate the Fourth Amendment.  *Settle v. Collier*, 160 F.4th 1282, 1288 (11th Cir. 2025) (quoting *Tennessee v. Garner*, 471 U.S. 1,

---

[2]  In *Tillis*, the Eleventh Circuit reversed this Court's denial of qualified immunity to an officer who fired multiple shots into a vehicle whose driver had led the officer on a high-speed chase and then, once the vehicle stopped and the officer began to approach on foot, started backing up close to the officer.  The Eleventh Circuit concluded that because the moving vehicle was so close to the officer and the officer only had "seconds to react," the officer "had reason to believe that his life was in danger."  *Tillis*, 12 F.4th at 1299.

11

11-12 (1985)); *accord Pipkins v. City of Hoover*, 134 F.4th 1163, 1172 (11th Cir. 2025).[3]  The "Fourth Amendment does not 'require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" *Settle,* 160 F.4th at 1288-89 (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007)).  And although the Fourth Amendment requires officers to issue a warning before using deadly force if feasible, the lack of a warning does not make the use of deadly force excessive where the officer only has a split second to react to a dangerous situation.  *See Pipkins*, 134 F.4th at 1173 (finding that a warning was not feasible where the officer had less than three seconds to react after seeing an armed man running toward two individuals).

It is clearly established, though, that it is objectively unreasonable for an officer to use deadly force if the suspect poses no danger to the officer or others.  Hernandez argues that the video here clearly shows that Rammage and Perez faced a non-

---

[3] In *Settle*, the Eleventh Circuit found that an officer was entitled to qualified immunity where the officer approached a suspect's truck on foot to execute an arrest warrant.  The suspect, who refused to leave his truck, started the engine and placed the transmission into a gear. Even though the suspect did not move the truck, he started the truck and moved the gear shift, so the officer reasonably recognized the suspect's "intent to drive the truck and so convert it into a deadly weapon." *Settle*, 160 F.4th at 1289.  In *Pipkins*, the Eleventh Circuit found that an officer did not violate the Fourth Amendment when he shot a man after hearing gunshots in a crowded mall and seeing the man holding a gun and running toward two other individuals.  The man turned out to be a Good Samaritan who was running to provide assistance, but the officer had probable cause to believe that he "was the shooter and a serious threat." *Pipkins*, 134 F.4th at 1172.

resisting suspect who posed no danger, and Hernandez points to two Eleventh Circuit cases that he contends are "materially similar" to his case.  In each "similar" case, a reasonable jury could conclude that the suspect posed no danger to the officers—and the officers knew it.  *See Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013) (concluding that an officer was not entitled to qualified immunity because a jury could conclude that he "shot an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger"); *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) (finding an officer was not entitled to qualified immunity because a jury could conclude that he fired shots into a truck where the suspects, though driving away from the officers on an interstate, did not present an immediate threat to the officer or others on the road).

While *Morton* and *Vaughan* clearly establish that deadly force is unconstitutional where an officer perceives that he faces an unarmed, nonthreatening suspect, neither case is materially similar to this one.  Here, the video shows that as Rammage and Perez approached Hernandez's BMW on foot, Hernandez leaned out of his window, the BMW's engine revved, and a loud popping noise came from the BMW.  Within two or three seconds after seeing Hernandez leaning out of the window with something in his hand (although the video does not clearly show what it was) and hearing the revving engine and a loud popping noise, Rammage and Perez fired shots

13

into the vehicle.  Hernandez did not point to any authority clearly establishing that it is unconstitutional for an officer to use deadly force under these circumstances.  As discussed above, deadly force is permitted where an officer would fairly conclude from the circumstances that his life is in danger due to a deadly weapon, such as a firearm or a vehicle that is reasonably perceived as posing an immediate threat.  For all these reasons, the Court finds that Hernandez did not allege sufficient facts (including the undisputed video) to show that Rammage and Perez violated his clearly established Fourth Amendment rights.  Accordingly, Rammage and Perez are entitled to qualified immunity on Hernandez's § 1983 claims against them.

## II.  Section 1983 Claims Against Chief Mathis and CCG

In addition to his individual capacity § 1983 claims against Rammage and Perez, Hernandez asserts § 1983 Fourth Amendment claims against CCG and its police chief, Stoney Mathis.  For Mathis and/or CCG to be liable, Rammage and Perez must have violated Hernandez's Fourth Amendment rights by using excessive force.  Although the Court has found Rammage and Perez to be entitled to qualified immunity because the complaint does not sufficiently allege the violation of a *clearly established* right, the Court has not found the absence of a constitutional violation.[4]  It is

---

[4] An officer is entitled to qualified immunity if (1) no constitutional violation occurred or (2) a violation occurred but the right alleged to have been violated was not clearly established under the circumstances.

14

doubtful that Hernandez's complaint, including the video, adequately alleges a constitutional violation by Rammage and/or Perez, but even if it did, Mathis and CCG would not be liable under the circumstances here.

Municipal liability and supervisor liability under § 1983 cannot be based on vicarious liability.  Instead, a municipality may only be held liable under § 1983 if its policy or custom was the moving force behind a constitutional violation.  *Bridges v. Poe*, 155 F.4th 1302, 1318 (11th Cir. 2025).  A supervisor may only be held liable under § 1983 if "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1355 (11th Cir. 2022) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).  Here, there is no allegation that Mathis personally participated in any unconstitutional conduct.  Rather, Hernandez asserts that CCG and Mathis may both be held liable under § 1983 because Mathis failed to train CCG officers on the proper use of force.

Municipalities and supervisors "may be held liable for failure to train their employees." *Bridges*, 155 F.4th at 1318.  A

---

*Swinford v. Santos*, 121 F.4th 179, 188 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 204 (2025).  Here, it was unnecessary in the Court's qualified immunity analysis to decide whether a violation occurred because the complaint fails to show that the conduct here amounted to a violation of *clearly established* Fourth Amendment law.

municipality or supervisor's failure to train officers is actionable under § 1983 "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the officers come into contact." *Id.* at 1317 (quoting *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1052 (11th Cir. 2014)). To state this type of claim, a plaintiff must allege facts to show that the supervisor or municipality's final policymaker had "actual or constructive notice that a particular omission in their training program" caused the municipality's officers to violate citizens' constitutional rights "yet still elected to retain that insufficient training program." *Id.* (quoting *Keith*, 749 F.3d at 1052). "Establishing notice ordinarily requires a 'pattern of similar constitutional violations by untrained employees.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

Here, Hernandez summarily alleges that Mathis was aware of a history of officers using excessive force and shooting at unarmed citizens. The complaint contains no details of the alleged history of excessive force, such as how many prior incidents occurred, when they occurred, or how often they occurred. Thus, the conclusory allegations do not show a history of widespread violations that would put Mathis on notice of a need to revise the training program. Hernandez also alleges that Mathis was aware of prior excessive force complaints against Rammage, but Hernandez does not allege any facts to show that these prior incidents

16

involved *unconstitutional* force that would put Mathis on notice of a need to provide additional training to Rammage.  And Hernandez did not make any factual allegations that would show a causal connection between a general failure to train officers on proper use of force and the alleged constitutional violation here, where the video does not clearly depict an unarmed suspect but instead shows Hernandez leaning out of his window as the engine revs and a loud popping noise comes from the BMW.  For all these reasons, the Court finds that Hernandez did not allege enough facts to establish municipal or supervisory liability.   Therefore, the Court dismisses Hernandez's § 1983 claims against CCG and Mathis.

CONCLUSION

For the reasons explained above, the Court grants Defendants' motion to dismiss as to all of Hernandez's § 1983 claims (ECF No. 6).  The remaining claims are state law claims, and Hernandez does not contend that the Court has original jurisdiction over those claims.  Having dismissed all claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over the state law claims.   *See* 28 U.S.C. § 1367(c)(3).  The Court dismisses those claims without prejudice.

IT IS SO ORDERED, this 28th day of May, 2026.

s/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

17